## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

**Case No.**

MARISOL BENITEZ RUIZ
and RONY LANZA GARCIA,

      Plaintiffs;

v.

BOSTON SCIENTIFIC CORPORATION;

      Defendant.

_____/

### COMPLAINT AND JURY DEMAND

Plaintiffs, by and through their undersigned counsel, bring this Complaint to set forth claims against the Defendant in this litigation, and allege:

### PARTIES, JURISDICTION, & VENUE

1. Plaintiff, Marisol Benitez Ruiz, is and was at all times material hereto a Miami-Dade County resident who had one or more of Defendant's Pelvic Mesh Products (the "Product") inserted into her body to treat medical conditions, primarily stress urinary incontinence.

2. Plaintiff, Rony Lanza Garcia, is and was at all times material hereto a Miami-Dade County resident who is the spouse of Marisol Benitez Ruiz.

3. Defendant is Boston Scientific Corporation ("Boston Scientific"), a Massachusetts corporation with its principal place of business in Massachusetts.  All acts and omissions of Boston Scientific as described herein were done by its agents, servants, employees

and/or owners, acting in the course and scope of their respective agencies, services, employments and/or ownership.

4. Federal subject matter jurisdiction in this action is based upon 28 U.S.C. § 1332(a), in that in this action there is complete diversity among Plaintiffs and Defendants and the amount in controversy exceeds $75,000.

5. Defendant has significant contacts with the Southern District of Florida such that they are subject to the personal jurisdiction of the court in said district.

6. A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the Southern District of Florida 28 U.S.C. § 1391(a), venue is proper in said district.

7. This cause of action arose out of Defendant's marketing and sale of its pelvic mesh in Florida, including the Product that was implanted in the Plaintiff.

## THE PRODUCT

8. Defendant's Pelvic Mesh Product relevant to this claim is the:

   a. Lynx Suprapubic Mid-Urethral Sling System with Advantage Blue Mesh bearing UPN M0068503000 (the "Product").

9. Boston Scientific Corporation designed, manufactured, packaged and labeled the Lynx Suprapubic Mid-Urethral Sling System with Advantage Blue Mesh, including that which was implanted in the Plaintiff.

## FACTUAL BACKGROUND

10. Defendant's Pelvic Mesh Product contains monofilament polypropylene mesh and/or collagen. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in the Plaintiff is biologically incompatible with human tissue

and promotes a negative immune response in a large subset of the population implanted

with Defendant's Pelvic Mesh Product.  This negative response promotes inflammation

of the pelvic tissue and can contribute to the formation of severe adverse reactions to the

mesh.  Furthermore, Defendant's collagen product causes hyper-inflammatory responses

leading to problems including chronic pain and fibrotic reaction.  Defendant's collagen

product disintegrates after implantation in the female pelvis.  The collagen product causes

adverse tissue reactions, and are causally related to infection, as the collagen is a foreign

organic material from animals.  Cross linked collagen is harsh upon the female pelvic

tissue.  It hardens in the body.  When mesh is inserted in the female body according to the

manufacturer's instructions, it creates a non-anatomic condition in the pelvis leading to

chronic pain and functional disabilities.

11. Defendant sought and obtained FDA clearance to market the Product under section

510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act.  Section

510(k) provides for marketing of a medical device if the device is deemed "substantially

equivalent" to other predicate devices marketed prior to May 28, 1976.  No formal review

for safety or efficacy is required, and no formal review for safety or efficacy was ever

conducted with regard to the Product.

12. On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that

"serious complications associated with surgical mesh for transvaginal repair of POP

(pelvic organ prolapse) are **not rare.**" (Emphasis in the original).

13. The FDA Safety Communication also stated, "*Mesh contraction* (shrinkage) is a

*previously unidentified risk* of transvaginal POP repair with mesh that has been reported

in the published scientific literature and in adverse event reports to the FDA… Reports in

the literature associate mesh contraction with vaginal shortening, vaginal tightening and

vaginal pain." (Emphasis in original).

14. In a December 2011 Joint Committee Opinion, the American College of Obstetricians

and Gynecologists ("ACOG") and the American Urogynecologic Society ("AUGS") also

identified physical and mechanical changes to the mesh inside the body as a serious

complication associated with vaginal mesh, stating:

> There are increasing reports of vaginal pain associated with changes that can
> occur with mesh (contraction, retraction, or shrinkage) that result in taut sections
> of mesh… Some of these women will require surgical intervention to correct the
> condition, and some of the pain appears to be intractable.

15. The ACOG/AUGS Joint Committee Opinion also recommended, among other things,

that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk

individuals in whom the benefit of mesh placement may justify the risk."

16. The injuries of the female Plaintiff are reported in the FDA Safety Communication and in

the ACOG/AUGS Joint Committee Opinion.

17. The FDA Safety Communication further indicated that the benefits of using transvaginal

mesh products instead of other feasible alternatives did not outweigh the associated risks

18. Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP

repair with mesh is more effective than traditional non-mesh repair in all patients with

POP and it may expose patients to greater risk."

19. Contemporaneously with the Safety Communication, the FDA released a publication

titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of

Transvaginal Placement for Pelvic Organ Prolapse" the "White Paper"). In the White

Paper, the FDA noted that the published, peer-reviewed literature demonstrates that

"[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

20. The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginally placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk." (Emphasis in original).

21. The FDA White Paper further stated that "these products are associated with serious adverse events… Compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

22. In its White Paper, the FDA advises doctors to, *inter alia*, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications."

23. The FDA concludes its White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

24. Defendant knew or should have known that the Product unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

25. The scientific evidence shows that the material from which Defendant's Product is made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Product, including the female Plaintiff named in this action.

26. The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code."  "Material fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The Product was unreasonably susceptible to degradation and fragmentation inside the body.

27. The Product was unreasonably susceptible to shrinkage and contraction inside the body.

28. The Product was unreasonable susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

29. The Product has been and continues to be marketed to the medical community and to patients as safe, effective, reliable, medical devices, implanted by safe and effective, minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of pelvic organ prolapse and stress urinary incontinence, and other competing products.

30. Defendant omitted the risks, dangers, defects, and disadvantages of the Product, and advertised, promoted, marketed, sold and distributed the Product as safe medical devices when Defendant knew or should have known that the Product was not safe for its intended purpose, and that the Product would case, and did cause, serious medical problems, and in some patients, including the female Plaintiff named in this action, catastrophic injuries.

31. Contrary to Defendant's representations and marketing to the medical community and to the patients themselves, the Product has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including the female Plaintiff named in the Short Form Complaint, making them defective under the law.

32. The specific nature of the Product's defects includes, but is not limited to, the following:

   a. the use of polypropylene and collagen material in the Product and the immune reactions that result from such material, causing adverse reactions and injuries;

   b. the design of the Product to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

   c. biomechanical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

   d. the use and design and arms and anchors in the Product, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

   e. the propensity of the Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

   f. the inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing

pain upon normal daily activities that involve movement in the pelvic region (e.g., intercourse, defecation, walking);

g.  the propensity of the Product for degradation of fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h.  the hyper-inflammatory response to collagen leading to problems including chronic pain and fibrotic reaction;

i.  the propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

j.  the adverse tissue reactions cause by the collagen products, which are causally related to infection, as the collagen is a foreign organic material from animals;

k.  the harshness of cross linked collagen upon the female pelvic tissue, and the hardening of the product in the body; and

l.  the creation of a non-anatomic condition in the pelvis leading to the chronic pain and functional disabilities when the mesh is implanting according the manufacturer's instructions.

33. The Product is also defective due to Defendant's failure to adequately warn or instruct the female Plaintiff named in this action and/or her health care providers of subjects including, but not limited to, the following:

a.  the Product's propensities to contract, retract, and/or shrink inside the body;

b.  the Product's propensities for degradation, fragmentation and/or creep;

c.  the Prodcut's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.   the rate and manner of mesh erosion or extrusion;

e.   the risk of chronic inflammation resulting from the Product;

f.   the risk of chronic infections resulting from the Product;

g.   the risk of permanent vaginal or pelvic scarring as a result of the Product;

h.   the risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i.   the need for corrective or revision surgery to adjust or remove the Product;

j.   the severity of complications that could arise as a result of implantation of the Product;

k.   the hazards associated with the Product;

l.   the Product's defects described herein;

m.   treatment of pelvic organ prolapse and stress urinary incontinence with the Product is no more effective than feasible available alternatives;

n.   treatment of pelvic organ prolapse and stress urinary incontinence with the Product exposes patients to greater risk than feasible available alternatives;

o.   treatment of pelvic organ prolapse and stress urinary incontinence with the Product makes future surgical repair more difficult than feasible available alternatives;

p.   use of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.   removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

    r.   complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

34. Defendant has underreported information about the propensity of the Product to fail and cause injury and complications and has made unfounded representations regarding the efficacy and safety of the Product through various means and media.

35. Defendant has failed to perform proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Product.

36. Defendant failed to design and establish a safe, effective procedure for removal of the Product, or to determine if a safe, effective procedure for removal of the Product exists.

37. Feasible and suitable alternatives to the Product have existed at all times relevant that do not present the same frequency or severity of risks as do the Product.

38. The Product was at all times utilized and implanted in a manner foreseeable to Defendant, as Defendant generated the instructions for use, created the procedures for implanting the device, and trained the implanting physician.

39. Defendant provided incomplete and insufficient training and information to physicians regarding the use of the Product and the aftercare of patients implanted with the Product.

40. The Product implanted in the female Plaintiff named in this action was in the same or substantially similar condition as they were in when they left Defendant's possession, and in the condition directed by and expected by Defendant.

41. The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Product includes, but is not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and

chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and

chronic pelvic pain.

42. In many cases, including the female Plaintiff named in this action, the women have been

forced to undergo extensive medical treatment, including, but not limited to, operations to

locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve

damage, the use of pain control and other medications, injections into various areas of the

pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

43. The medical and scientific literature studying the effects of Defendant's mesh product,

like that of the Product implanted in the female Plaintiff named in this action, has

examined each of these injuries, conditions, and complications, and has reported that they

are causally related to the Product.

44. Removal of contracted, eroded and/or infected mesh can require multiple surgical

interventions for removal of mesh and results in scarring on fragile compromised pelvic

tissue and muscles.

45. At all relevant times herein, Defendant continued to promote the Product as safe and

effective even when no clinical trials had been done supporting long- or short-term

efficacy.

46. In doing so, Defendant failed to disclose the known risks and failed to warn of known or

scientifically knowable dangers and risks associated with the Product.

47. At all relevant times herein, Defendant failed to provide sufficient warnings and

instructions that would have put the female Plaintiff named in this action and the general

public on notice of the dangers and adverse effects caused by implantation of the Product.

48. The Product as designed, manufactured, distributed, sold and/or supplied by Defendant was defective as marketed due to inadequate warnings, instructions, labeling, and/or inadequate testing in the presence of Defendant's knowledge of lack of safety.

49. As a result of having the Product implanted in her, the female Plaintiff named in this action has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## PLAINTIFF'S MEDICAL HISTORY

50. In 2010, Plaintiff began experiencing pain, discomfort, and infections in the pelvic region.

51. She was diagnosed with stress urinary incontinence in 2011, and the Product was implanted by operation.

52. In August of 2020, when the Product was surgically removed, Plaintiff then realized that the Product was causing continuing health issues.

## CAUSES OF ACTION

## COUNT I: NEGLIGENCE

53. Plaintiffs incorporate by reference paragraphs 1-52 of the Complaint as if fully set forth herein.

54. Defendant had a duty to the female Plaintiff named in this action to use reasonable care in designing, manufacturing, marketing, labeling, packaging and selling the Product.

55. Defendant was negligent in failing to use reasonable care as described herein in designing, manufacturing, marketing, labeling, packaging and selling the Product. Defendant breached their aforementioned duty by:

   a. Failing to design the Product so as to avoid an unreasonable risk of harm to women in whom the Product was implanted, including the female Plaintiff named in this action;

   b. Failing to manufacture the Product so as to avoid an unreasonable risk of harm to women in whom the Product was implanted, including the female Plaintiff named in this action;

   c. Failing to use reasonable care in the testing of the Product so as to avoid an unreasonable risk of harm to women in whom the Product was implanted, including the female Plaintiff named in this action;

   d. Failing to use reasonable care in inspecting the Product so as to avoid an unreasonable risk of harm to women in whom the Product was implanted, including the female Plaintiff named in this action;

   e. Otherwise negligently or carelessly designing, manufacturing, marketing, labeling, packaging and/or selling the Product.

56. The reasons that Defendant's negligence caused the Product to be unreasonably dangerous and defective include, but are not limited to:

   a. The use of polypropylene material and/or collagen material in the Product and the immune reaction that results from such material, causing adverse reactions and injuries;

b. The design of the Product to be inserted into and through an area of the body high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c. Biochemical issues with the design of the Product, including, but not limited to, the propensity of the Product to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d. The use and deign of arms and anchors in the Product, which, when placed in the women, are likely to through contaminated spaces and injure major nerve routes in the pelvic region;

e. The propensity of the Product for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

f. The inelasticity of the Product, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis 9 (e.g., intercourse, defecation); and

g. The propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h. The hyper-inflammatory response to collagen leading to problems including chronic pain and fibrotic reaction;

i. The propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

j. The harshness of cross linked collagen upon the female pelvic tissue, and the hardening of the product in the body;

k. The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions.

57. Defendant also negligently failed to warn or instruct the female Plaintiff named in this action and/or health care providers of subjects including, but not limited to, the following:

a. The Product's propensity to contract, retract, and/or shrink inside the body;

b. The Product's propensities for degradation, fragmentation and/or creep;

c. The Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d. The rate and manner of mesh erosion or extrusion;

e. The risk of chronic inflammation resulting from the Product;

f. The risk of chronic infections resulting from the Product;

g. The risk of permanent vaginal or pelvic scarring as a result of the Product;

h. The risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i. The need for corrective or revision surgery to adjust or remove the Product;

j. The severity of complications that could arise as a result of the implantation of the Product;

k. The hazards associated with the Product;

l. The Product's defects described herein;

m. Treatment of pelvic organ prolapse and stress urinary incontinence with the Product is no more effective than feasible available alternatives;

n. Treatment of pelvic organ prolapse and stress urinary incontinence with the Product exposes patients to greater risk than feasible available alternatives;

o. Treatment of pelvic organ prolapse and stress urinary incontinence with the Product makes future surgical repair more difficult than feasible available alternatives;

p. Removal of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q. Removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r. Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

58. As a direct and proximate result of Defendant's negligence, the female Plaintiff named in this action has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT

59. Plaintiffs incorporate by reference paragraphs 1-58 of the Complaint as if fully set forth herein.

60.  The Product implanted in the female Plaintiff named in this action was not reasonably

safe for its intended uses and was defective as described herein with respect to its design.

As previously stated, the Product's design defects include, but are not limited to:

a.  The use of polypropylene material and/or collagen material in the Product and the

immune reaction that results from such material, causing adverse reactions and

injuries;

b.  The design of the Product to be inserted into and through an area of the body high

levels of bacteria that adhere to the mesh causing immune reactions and

subsequent tissue breakdown and adverse reactions and injuries;

c.  Biochemical issues with the design of the Product, including, but not limited to,

the propensity of the Product to contract or shrink inside the body, that in turn

cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting

in injury;

d.  The use and deign of arms and anchors in the Product, which, when placed in the

women, are likely to through contaminated spaces and injure major nerve routes

in the pelvic region;

e.  The propensity of the Product for "creep," or to gradually elongate and deform

when subject to prolonged tension inside the body;

f.  The inelasticity of the Product, causing it to be improperly mated to the delicate

and sensitive areas of the pelvis where they are implanted, and causing pain upon

normal daily activities that involve movement in the pelvis 9 (e.g., intercourse,

defecation); and

g. The propensity of the Product for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time;

h. The hyper-inflammatory response to collagen leading to problems including chronic pain and fibrotic reaction;

i. The propensity of the collagen products to disintegrate after implantation in the female pelvis, causing pain and other adverse reactions;

j. The adverse tissue reactions caused by the collagen products, which are causally related to infection, as the collagen is a foreign organic material from animals;

k. The harshness of cross linked collagen upon the female pelvic tissue, and the hardening of the product in the body;

l. The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanted according to the manufacturer's instructions.

61. As a direct and proximate result of the Product's aforementioned defects as described herein, the female Plaintiff named in this action has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

62. Defendant is strictly liable to the female Plaintiff named in this action for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

## COUNT III: STRICT LIABILITY – MANUFACTURING DEFECT

63. Plaintiffs incorporate by reference paragraphs 1-62 of this Complaint as if fully set forth herein.

64. The Product implanted in the female Plaintiff named in this action was not reasonably safe for its intended uses and was defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Defendant's design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to the female Plaintiff named in this action.

65. As a direct and proximate result of the Product's aforementioned defects as described herein, the female Plaintiff named in this action has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

66. Defendant is strictly liable to the female Plaintiff named in this action for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

## COUNT IV: STRICT LIABILITY – FAILURE TO WARN

67. Plaintiffs incorporate by reference paragraphs 1-67 of this Complaint as if fully set forth herein.

68. The Product implanted in the female Plaintiff named in this action was not reasonably safe for its intended uses and was defective as described herein as a matter of law due to their lack of appropriate and necessary warnings.  Specifically, Defendant did not provide sufficient or adequate warning, regarding, among other subjects:

a.  The Product's propensity to contract, retract, and/or shrink inside the body;

b.  The Product's propensities for degradation, fragmentation and/or creep;

c.  The Product's inelasticity preventing proper mating with the pelvic floor and vaginal region;

d.  The rate and manner of mesh erosion or extrusion;

e.  The risk of chronic inflammation resulting from the Product;

f.  The risk of chronic infections resulting from the Product;

g.  The risk of permanent vaginal or pelvic scarring as a result of the Product;

h.  The risk of recurrent, intractable pelvic pain and other pain resulting from the Product;

i.  The need for corrective or revision surgery to adjust or remove the Product;

j.  The severity of complications that could arise as a result of the implantation of the Product;

k.  The hazards associated with the Product;

l.  The Product's defects described herein;

m.  Treatment of pelvic organ prolapse and stress urinary incontinence with the Product is no more effective than feasible available alternatives;

n.  Treatment of pelvic organ prolapse and stress urinary incontinence with the Product exposes patients to greater risk than feasible available alternatives;

o.  Treatment of pelvic organ prolapse and stress urinary incontinence with the Product makes future surgical repair more difficult than feasible available alternatives;

p.   Removal of the Product puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q.   Removal of the Product due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

r.   Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain.

69. As a direct and proximate result of the Product's aforementioned defects as described herein, the female Plaintiff named in this action has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

70. Defendant is strictly liable to the female Plaintiff named in this action for designing, manufacturing, marketing, labeling, packaging and selling a defective product.

<u>COUNT V: BREACH OF EXPRESS WARRANTY</u>

71. Plaintiffs incorporate by reference paragraphs 1-70 of this Complaint as if fully set forth herein.

72. Defendant made assurances as described herein to the general public, hospitals and health care professionals that the Product was safe and reasonably fit for its intended purposes.

73. The female Plaintiff named in this action and/or healthcare provider chose the Product based upon Defendant's warranties and representations as described herein regarding the safety and fitness of the Product.

74. The female Plaintiff named in this action, individually and/or by and through her physician, reasonably relied upon Defendant's express warranties and guarantees that the Product was safe, merchantable, and reasonably fit for its intended purposes.

75. Defendant breached these warranties because the Product implanted in the female Plaintiff named in this action was unreasonably dangerous and defective as described herein and not as Defendant has represented.

76. Defendant breached these express warranties because the Product implanted in the female Plaintiff named in this action were unreasonably dangerous and defective as described herein and not as Defendant has represented.

77. Defendant's breach of their express warranties resulted in the implantation of an unreasonably dangerous and defective product in the body of the female Plaintiff named in this action, placing said Plaintiff's health and safety in jeopardy.

78. As a direct and proximate result of Defendant's breach of the aforementioned express warranties, the female Plaintiff named in this action has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## COUNT VI: BREACH OF IMPLIED WARRANTY

79. Plaintiffs incorporate by reference paragraphs 1-78 of this Complaint as if fully set forth herein.

80. Defendant impliedly warranted that the Product was merchantable and was fit for the ordinary purposes for which it was intended.

81. When the Product was implanted in the female Plaintiff named in this action to treat her pelvic organ prolapse and/or stress urinary incontinence, the Product was being used for the ordinary purposes for which it was intended.

82. The female Plaintiff named in this action, individually and/or by and through her physician, relied upon Defendant's implied warranties of merchantability in consenting to have the Product implanted in her.

83. Defendant breached these implied warranties of merchantability because the Product implanted in the female Plaintiff named in this action was neither merchantable nor suited for its intended uses as warranted.

84. Defendant's breach of their implied warranties resulted in the implantation of unreasonably dangerous and defective products in the body of the female Plaintiff named in this action, placing said Plaintiff's health and safety in jeopardy.

85. As a direct and proximate result of Defendant's breach of the aforementioned implied warranties, the female Plaintiff named in this action has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, lost income, and other damages.

## COUNT VII: LOSS OF CONSORTIUM

86. Plaintiffs incorporate by reference paragraphs 1-85 of this Complaint as if fully set forth herein.

87. As a direct and proximate result of the above-described injuries sustained by the female Plaintiff named in this action, where applicable, her husband named in this action has

suffered a loss of his wife's consortium, companionship, society, affection, services and support.

<u>COUNT VIII: PUNITIVE DAMAGES</u>

88. Plaintiffs incorporate by reference paragraphs 1-87 of this Complaint as if fully set forth herein.

89. Defendant sold its Product to the healthcare providers of the female Plaintiff named in this action and other healthcare providers in the state of implantation and throughout the United States without doing adequate testing to ensure that the Product was reasonably safe for implantation in the female pelvic area.

90. Defendant sold the Product to the female Plaintiff name in this action's health care providers and other health care providers in the state of Florida and throughout the United States in spite of their knowledge that Product can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this complaint, thereby causing severe and debilitating injuries suffered by the Plaintiff named in this action and numerous other women.

91. Defendant ignored reports from patients and healthcare providers through the United States and elsewhere of the Product's failures to perform as intended, which lead to the severe and debilitating injuries suffered by the Plaintiff named in this action and numerous other women.  Rather than doing adequate testing to determine the cause of these injuries, or to rule out the Product's designs or the processes by which the Product is manufactured as the cause of these injuries, Defendant chose instead to continue to market and sell the Product as safe and effective.

Case No.:
Page **25** of **26**

92. Defendant knew the Product was unreasonably dangerous in light of its risks of failure, pain and suffering, loss of life's enjoyment, remedial surgeries and treatments in an effort to cure the conditions proximately related to the use of the Product, as well as other severe and personal injuries which were permanent and lasting in nature.

93. Defendant withheld material information from the medical community and the public in general, including the female Plaintiff named in this action, regarding the safety and efficacy of the Product.

94. Defendant knew and recklessly disregarded the fact that the Product caused debilitating and potentially life altering complications with greater frequency than feasible alternative methods and/or products used to treat pelvic organ prolapse and stress urinary incontinence.

95. Defendant misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Product.

96. Notwithstanding the foregoing, Defendant continues to aggressively market the Product to consumers without disclosing the true risks associated with the Product.

97. Defendant knew of the Product's defective and unreasonably dangerous nature, but continued to manufacture, market, distribute, and sell the Product so as to maximize sales and profits at the expense of the health and safety of the public, including the female Plaintiff named in this action.

98. Defendant continues to conceal and/or fail to disclose to the public, including the female Plaintiff named in this action, the serious complications associated with the use of the Product to ensure continued and increased sales of the Product.

99. Defendant's conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

WHEREFORE, the Plaintiffs demand a trial by jury, judgment against Defendants for compensatory and punitive damages in an amount exceeding $75,000, as well as costs, attorney fees, interest, or any other relief, monetary or equitable, to which they are entitled.

PLAINTIFFS DEMAND A TRIAL BY JURY.

Respectfully submitted,

*/s/ Nicholas A. DeMahy*

Nicholas A. DeMahy
Florida Bar No. 123790
JOSE M. FRANCISCO, P.A.
*Attorney for Plaintiff*
8660 W. Flagler Street
Suite 100
Miami, FL 33144
Tel: (305) 649-2213 Ext. 1015
litigationattorney1@jmflawyers.com
litigationsec1@jmflawyers.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 26, 2021 I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record or *pro se* parties identified on the following Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

*/s/ Nicholas A. DeMahy*